NOT DESIGNATED FOR PUBLICATION

No. 115,755

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of
C.K., YOB 2002, a female, and
R.A.K., YOB 2005, a male.

MEMORANDUM OPINION

Appeal from Douglas District Court; PEGGY C. KITTEL, judge. Opinion filed March 31, 2017.
Affirmed.

*Napoleon S. Crews*, of Crews Law Firm, of Lawrence, for appellant natural mother.

*Jody M. Meyer*, of Lawrence, for appellant natural father

*Kate Duncan Butler*, assistant district attorney, and *Charles E. Branson*, district attorney, for
appellee.

Before GARDNER, P.J., PIERRON and ATCHESON, JJ.

*Per Curiam*: C.K. (born in 2002) and R.A.K. (born in 2005) are the natural
children of K.W. (Mother) and W.K. (Father). The children were twice adjudicated
children in need of care. The district court held a termination trial on August 10-14, 2015,
September 24, 2015, and October 28-29, 2015. The court terminated Mother's and
Father's parental rights, and both parents appeal.

Mother and Father divorced in 2011, and the children lived with Mother while
Father worked overseas in Iraq. In November 2011, the Department for Children and
Families (DCF) took C.K. and R.A.K. into protective custody, and a court adjudicated

them children in need of care (CINC) on February 6, 2012. The basis for this first CINC petition was R.A.K. had accused Mother's boyfriend, W.R., of sexual abuse. DCF substantiated W.R. for abuse against R.A.K. W.R. appealed the finding, but DCF upheld it. A jury acquitted W.R. of the associated criminal charges in October 2012. The children reintegrated with Mother in January 2013, and the CINC case concluded in July 2013. As part of the custody order and parenting plan concluding the CINC case, Mother was instructed not to allow contact between the children and W.R. Father stopped going overseas to Iraq in November 2012.

In September 2013, R.A.K. told a social worker for DCF that W.R. was living in his home. He identified W.R. as his dad. He said W.R. was aggressive and "yells and stuff like that." The same social worker interviewed C.K. C.K. denied W.R. was living in their home. Mother denied W.R. was in her home.

On April 27, 2014, law enforcement responded to a domestic disturbance call at Mother's home. During an argument, W.R. had "head-butted" Mother and broken a glass door. Mother had a large swollen knot on her head. Mother told police W.R. was her fiancé, and he had been living with her since July 2013. W.R. told police he had been living with Mother since November 2012.

On May 2, 2014, a DCF social worker interviewed R.A.K. and C.K. about the incident. R.A.K. stated W.R. lived in their home. He said he had heard Mother and W.R. fighting sometimes. C.K. said W.R. had been living in their home since August 2013, and Mother and W.R. often argued. The DCF social worker interviewed Mother who said she and W.R. had gotten in a fight at a bar, and W.R. had followed her home. Mother said she did not know how she got the knot on her head or how the glass door shattered. She denied that W.R. was living with them. When confronted with the children's stories, she said R.A.K. was not credible and did not know timelines.

2

On May 5, 2014, the district court entered an ex parte order placing C.K. and R.A.K. in custody with DCF. In the order, the court found Mother had failed to protect her children by allowing them to be around W.R., and Father was unavailable because he was in a federal prison at the time. On May 8, 2014, the State filed a petition seeking to have C.K. and R.A.K. adjudicated as CINCs. On July 25, 2014, the district court entered a temporary custody order keeping the children in the temporary custody of DCF. Father was still incarcerated at the time. The court scheduled a formal hearing on October 29, 2014.

On October 29, 2014, each parent and the guardian ad litem entered a no contest statement to the allegations contained in the petition that the children were CINCs. The district court proceeded to hear evidence regarding the disposition. The court then took the disposition under advisement in order to review the record in the prior CINC case.

On November 17, 2014, the State filed a motion for the court to consider additional information. The State noted that Mother had testified at the October hearing that she was no longer in a relationship with W.R. and had not been in a relationship with him for 6 months. Since the hearing, however, a DCF attorney had seen Mother and W.R. together at a social gathering. The attorney was familiar with Mother and W.R. because she had handled the appeal of W.R.'s DCF substantiation.

On March 12, 2015, the district court issued its ruling regarding the disposition. The court determined that reintegration with either parent was no longer a viable option and that it was in the children's best interests that the case plan be adoption. The court ordered the district attorney to file a motion to terminate parental rights within 30 days pursuant to K.S.A. 2015 Supp. 38-2255(f).

The State filed a motion to terminate Mother's and Father's parental rights to C.K. and R.A.K. on April 13, 2015. The State filed an addendum to the motion indicating it

intended to apply a presumption of unfitness to Mother. The termination trial was held on August 10-14, 2015, September 24, 2015, and October 28-29, 2015.

The permanency plan for Mother required her to stay in contact with agencies and update her contact information as necessary; sign all necessary releases; complete parenting and psychological evaluations and follow all recommendations; stay actively involved in all medical, mental health, school, etc. appointments for R.A.K. and C.K.; avoid all contact with W.R. and not allow W.R. to have contact with the children; and maintain safe and stable housing and adequate employment.

The permanency plan for Father required him to stay in contact with agencies and update his contact information as necessary; sign all necessary releases; complete parenting and psychological evaluations and follow all recommendations; stay actively involved in all medical, mental health, school, etc. appointments for R.A.K. and C.K.; and maintain safe and stable housing and adequate employment.

At the termination trial, Mother testified she was living with W.R. in Lawrence. W.R. had lived with her off and on from January to July 2013 and moved back in with her at the end of the summer in 2013. He had moved back in with her less than 2 months after she signed a parenting plan acknowledging she was not to allow W.R. to be around the children. Mother admitted she was in a relationship with W.R. at the time of the October 29, 2014, hearing. She said she lied at that hearing because she wanted her children back.

Mother testified she was in shock when R.A.K. first told her W.R. had sexually abused him, and she and W.R. called the police together. Over time, however, she started to question the allegations. She claimed there was conflicting DNA evidence. She said she had watched the video of R.A.K.'s interview with police, and R.A.K. denied the sex abuse had occurred. She could not remember exactly how R.A.K. denied the allegations

4

in the video, but she said he changed his story five times. She said R.A.K. denied the allegations on the stand at trial, but she admitted she had not watched the trial.

Mother had not had any conversations with R.A.K. about the incident since he first made the allegations, even though R.A.K. remained in her custody for several weeks afterward. She said R.A.K. had an active imagination and had said questionable things before. She thought the allegations were possibly a ploy by Father to split up Mother and W.R. Mother stated she believed W.R. over R.A.K.

Mother testified she was currently working as a massage therapist and making at least $2,000 a month. She had spent 3 years in the military, had worked for a prison for 1 year, and had run a cleaning business from 2012-2014. She had worked at American Eagle and a strip club in Topeka. Because she had been in the military, she received VA benefits. At the time of the trial, she was renting a four-bedroom house for $900 a month. For a period of time, starting in January 2012, Father had been sending money to Mother to cover living costs.

Mother told the district court she had been diagnosed with appendix cancer in September 2014 and had taken 2 months off work. She had two surgeries and went through a round of chemotherapy. The cancer was currently in remission.

Mother testified that she wanted her family back. By "family," she meant C.K., R.A.K., and W.R. She wanted to reintegrate with her children, but she knew that part of her case plan required her not to have a relationship with W.R. She acknowledged that in this respect she had not been following the district court's orders.

The case managers and other service providers working with the family did not express concern regarding Mother's general parenting ability. She provided structure at home and attended medical appointments. Rather, they consistently expressed concerns

regarding her ability to keep her children away from W.R. According to Rebecca Cruse, the family's case manager from December 2011 until March 2012, Mother consistently believed from the beginning of the case that W.R. had not sexually abused R.A.K. Sally McVey, a family support worker from June 2015 until August 2015, testified Mother said W.R. had been found not guilty, so there was no reason he should not be around her children. Others expressed concern that Mother may have attempted to coach or influence R.A.K. to deny his earlier allegations during the course of the trial.

Throughout the case, Mother routinely denied she was in a relationship with W.R. or that W.R. was living with her. She told the children not to tell service providers about W.R. Nancy Moses, the family's aftercare worker from January 2013 until August 2013, visited Mother's home at least 18 times in response to suspicions that W.R. was in the home, but she never found any indication that a man was living in the home. This contradicted W.R.'s testimony that they never hid the fact he was living with Mother during this time.

Father testified that since returning from Iraq in November 2012, he had three criminal convictions. He was convicted of possession of a firearm while under indictment stemming from an incident in March 2013. He served 18 months in federal prison on that charge and was released in September 2014. When he was released, he still had a pending DUI charge from 2011. He spent 60 days in the Leavenworth County Jail on that charge. He then spent almost a month in the Shawnee County Jail on a battery charge. The battery charge arose from an incident in February 2013 when Father tried to hit W.R. with his car.

At the time of the termination trial, Father was on federal probation until September or October 2017. He was on probation in Shawnee County, one of the terms of which was that he must stay away from W.R. He was on municipal probation out of Lansing. He had a suspended license due to the DUI. Father testified he had no new

6

criminal charges in the past 2 years. Service providers, however, had seen Father driving on multiple occasions despite his suspended license. Later in the trial, Father admitted his probation out of Lansing had been revoked and reinstated. The record is not clear on when Father's probation was revoked. He admitted his probation was revoked on December 9, 2015. However, he testified to this on October 29, 2015. His probation was revoked because he was not reporting as directed, he did not provide proof of substance abuse treatment, and he was not making payments to the court. He failed to show for a meeting with his probation officer on September 28, 2015.

Father testified he received an honorable discharge from the military in 2010, and he was currently serving in the U.S. Army Reserves. Since being released from prison in September 2014, he had a job at Applebee's and another at a locally owned restaurant. During his first time on the stand in August 2015, he said he currently had a part-time job at Wal-Mart and a part-time job helping veterans write resumes. Father testified again in October 2015. At that time, he had been working at Carrabba's Italian Restaurant for 6 weeks, which was his longest period of employment since being released from prison in September 2014. He had never actually worked at Wal-Mart, as he previously stated, because Wal-Mart later did a background check and rescinded his employment offer.

Father received discharge papers while at court on October 29, 2015. The U.S. Army Reserves discharged Father under other than honorable circumstances. Father testified the discharge came as a surprise, though he had previously inquired about the possibility of a discharge.

Since being released from federal prison in September 2014, Father had lived in a number of different locations. He spent some time at a half-way house before moving to the domiciliary at the VA. The domiciliary later expelled him due to an incident involving another resident. He then moved into an apartment with a friend in

7

Leavenworth and then moved with that friend into a house in Leavenworth. By October 2015, Father had moved in with a new girlfriend in Blue Springs, Missouri.

Since the divorce, Father had not cared for the children for more than a day or two at a time. Before November 2012, he spent a significant amount of time working in Iraq. During the first CINC case, Father indicated he would move back to the United States if necessary. He preferred, however, to continue working in Iraq because he was earning a high salary and wanted Mother to continue caring for the children. Nevertheless, he complained that KVC was making too many demands of Mother as she was a single parent. According to Father, KVC could not expect Mother to attend the children's school and medical appointments and hold a full-time job. One service provider noted that Father made efforts to be involved with his children to the extent possible while he was in Iraq.

Service providers expressed a number of concerns regarding Father's parenting ability. Jean Dirks, a psychologist who performed psychological and parenting evaluations of both parents, noted Father's biggest parenting drawbacks were his decision to take a high paying job overseas over caring for his children and his desire that Mother should have continued contact with the children. Caroline Crawford, an outpatient therapist who provided family therapy, expressed concerns about Father's ability to set limits and his tendency to make promises to the children. She noted that Father was doing well at the time of the trial, but she worried how he would bode in the long-term when he faced triggers. She testified the biggest problems for Father were housing, transportation, and mental health.

Several service providers noted Father either arrived late to or missed altogether numerous scheduled appointments or visits with the children. They expressed concerns regarding his ability to comply with R.A.K.'s care routine. R.A.K. had attention deficit hyperactivity disorder, Asperger's Syndrome, and an adrenal insufficiency that resulted in

8

hypothyroidism. He required several daily medications and regular doctor's appointments. Father did not have a detailed knowledge of this routine. While Father had expressed interest in learning R.A.K.'s care routine, he did not follow through. He may have even failed to give medications in some instances. Father had expressed some doubt regarding R.A.K.'s Asperger's diagnosis. While he stated he did not necessarily disagree with it, he had seen "fad" diagnoses. He personally did not see R.A.K. as disabled.

Father testified he had doubts regarding R.A.K.'s allegations of sexual abuse. He explained he did not have all the evidence, so he could not form an opinion. Based on his personal experience, he questioned the motives of law enforcement. He did not, however, question the DCF substantiation of the abuse.

Service providers noted a number of positives regarding Father's parenting abilities. Ryan Talley, the family's case manager from June 2014 until June 2015, noted Father had initiated contact in the second CINC case even though he was incarcerated at the time. Talley had no other concerns with the amount of contact he had with Father while he was incarcerated. Father wrote letters to his children. Father was developing a positive bond with C.K. He was able to calm R.A.K. when he became upset.

As for Father's mental health, parenting evaluators testified Father displayed narcissistic and antisocial personality traits, low impulse control, aggressiveness, and alcohol use disorder. Dirks explained Father's low impulse control and antisocial personality traits set a bad example for the children, demonstrating a quickness to anger and aggression, and an unwillingness to obey the rules. She doubted Father's narcissism would affect his parenting. However, Erin Sawyer, a KVC psychologist, worried that Father's narcissism might prevent him from "be[ing] able to anticipate the needs of his children" or "be[ing] emotionally available to them."

9

Father testified he had participated in cognitive thinking classes while incarcerated. He had participated in PTSD and depression treatment through the VA while living at the domiciliary. He admitted he had completed treatment for PTSD before the incident resulting in his expulsion from the VA domiciliary. He had his last drink in March 2013 and was participating in an alcohol and substance abuse program through Fort Leavenworth and the VA. He attended AA twice a week through the VA and a local church. He was participating in an anger management class and family therapy with C.K. and R.A.K.

Father had a volatile relationship with Mother over the course of the two CINC cases. While in Iraq, Father sent a stipend to Mother during the first CINC case. He explained he wanted to alleviate any financial stress she might have so she could focus on getting the children back. He testified, however, that he had someone follow Mother for 2 weeks while he was in Iraq. Dirks testified that Father had sent Mother emails telling her to kill herself in December 2011. Mother, who was battling cancer, testified Father had told her she deserved to have cancer.

Father expressed numerous concerns that Mother was allowing W.R. to have contact with the children. He notified service providers about his concerns, but he felt they were not taking adequate action. In February 2013, Father passed out flyers with W.R.'s mugshot around Mother's neighborhood. He went to W.R.'s home, believing the children were there and hoped he could catch W.R. in violation of court orders. This visit to W.R.'s home resulted in Father's battery charge. Mother eventually got a protection from abuse order against Father in the spring of 2013.

Father demonstrated aggressive behavior towards service providers. Service providers testified he sent condescending and abrasive emails. Father denied that his emails were belligerent. Rather, he felt that service providers had been lacking in

professionalism. He admitted, though, that his style of communication was blunt and could sometimes be inappropriate.

C.K.'s foster mother testified that Father had made a number of inappropriate comments to C.K. and herself. He once told C.K. over the phone that he had taken a psychological examination and he was going to go away for a while, and Mother was never going to leave W.R. In another call, he told C.K. that he knew she wanted to stay with her foster mother, but that was not going to happen. He later warned C.K.'s foster mother in a text that when he got the children back, he would be the one to decide if she ever got to see C.K. again.

C.K.'s foster mother testified she had received a link to a Go Fund Me page. The page had a photograph of C.K. and R.A.K. and provided brief details about the CINC case. The page appeared to her to be raising money for Father's attorney fees. When she called Father about the page, he said his girlfriend had set up the page. It was gone within an hour of that phone call.

Father testified he did not want to lose his parental rights, and he ultimately wanted the children to come live with him. He admitted, though, that it would be "[q]uite a process" before the children could reintegrate with him, and the children could not come to live with him immediately.

According to several service providers, both children had expressed a preference to live with their Mother but without W.R. R.A.K. told his foster mother that W.R. had abused Mother, he hated W.R., and he did not ever want to live with him again. Both children felt their Mother was choosing W.R. over them. C.K. told her foster mother, "I don't understand why Mom is picking [W.R.] over me and [R.A.K.]" R.A.K. similarly expressed that his Mother had a choice between them and W.R., and he felt like Mother did not care about them. According to R.A.K.'s foster mother, R.A.K. described incidents

11

of both sexual and physical abuse perpetrated by W.R. C.K. told her foster mother that W.R. had slammed a door in her face.

While C.K. enjoyed visits with Father, she said she did not want to live with him. Crawford noted C.K. was already parentified, and C.K. worried that if they reintegrated with Father, she would be responsible for giving R.A.K. his medication. C.K. made similar comments to her foster mother, but she later said Father was more attentive than she originally thought.

Crawford testified that terminating the parents' rights would do harm to both the children. She believed C.K. might experience some increased behavioral problems if the district court terminated parental rights. C.K. said she would be sad and devastated if her parents were out of her life. Crawford worried, though, that the cycle of abuse would continue if the children reintegrated with Mother. She stated that stability was very important for C.K. According to Crawford, adoption was not C.K.'s first choice, but she would be okay with it. She stated R.A.K. had accepted the word "adoption." Crawford testified that both C.K. and R.A.K. were content with their foster homes.

The district court later issued an order finding both parents unfit and terminating their parental rights. The court applied two presumptions of unfitness to both parents because the children had twice been adjudicated CINC, they had been in an out-of-home placement for more than a year, and the parents had neglected or refused to comply with a reintegration plan. The court found Mother had failed to adjust her circumstances and conduct to meet the children's needs, and she had emotionally abused and neglected the children by allowing W.R. to continue to have contact with them. The court determined Father was unfit because he had a criminal record and had spent time in prison; he had mental health issues; and he had failed to adjust his circumstances to meet the children's needs. The court held that reasonable efforts made by public and private agencies had

12

failed to rehabilitate the family, and the best interests of the children required termination of Mother's and Father's parental rights. Both Mother and Father appeal.

Mother first argues the district court erred in finding she was unfit and would remain unfit for the foreseeable future.

The Kansas Legislature has specified that the State must prove "by clear and convincing evidence that the child is a child in need of care." K.S.A. 2015 Supp. 38-2250. In addition to child in need of care adjudications, the clear and convincing evidence standard of proof applies to all termination of parental rights cases. K.S.A. 2015 Supp. 38-2269(a).

> "[W]hen an appellate court reviews a trial court's determination that a child is in need of care, it should consider whether, after review of all the evidence, viewed in the light most favorable to the State, it is convinced that a rational factfinder could have found it highly probable, *i.e.*, by clear and convincing evidence that the child was a CINC." *In re B.D.-Y.*, 286 Kan. 686, 705, 187 P.3d 594 (2008).

See *In re K.W.*, 45 Kan. App. 2d 353, 354, 246 P.3d 1021 (2011) (applying standard of review). In making this determination, this court does not weigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact. *In re B.D.-Y.*, 286 Kan. at 705.

The Revised Kansas Code for Care of Children provides that the district court may terminate parental rights when a child has been adjudicated a child in need of care. K.S.A. 2015 Supp. 38-2269(a). The statute lists nonexclusive factors the court shall consider in making a determination of unfitness. K.S.A. 2015 Supp. 38-2269(b). The court must consider a separate list of nonexclusive factors when a child is not in the parent's physical custody. K.S.A. 2015 Supp. 38-2269(c). Any one of the factors in K.S.A. 2015 Supp. 38-2269(b) or (c) may, but does not necessarily, establish grounds for

13

termination of parental rights. K.S.A. 2015 Supp. 38-2269(f). Upon making a finding of unfitness of the parent, "the court shall consider whether termination of parental rights as requested in the petition or motion is in the best interests of the child." K.S.A. 2015 Supp. 38-2269(g)(1). In making such a decision, the court shall give primary consideration to the physical, mental, and emotional needs of the child. K.S.A. 2015 Supp. 38-2269(g)(1).

In making its determination that Mother was unfit, the district court relied on the following factors:

1. K.S.A. 2015 Supp. 38-2269(b)(2), conduct toward a child of a physically, emotionally, or sexually cruel or abusive nature;
2. K.S.A. 2015 Supp. 38-2269(b)(4), physical, mental, or emotional abuse or neglect or sexual abuse of a child;
3. K.S.A. 2015 Supp. 38-2269(b)(7), failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family; and
4. K.S.A. 2015 Supp. 38-2269(b)(8), lack of effort on the part of the parent to adjust the parent's circumstances, conduct, or conditions to meet the needs of the child.

The district court found that a presumption of unfitness under K.S.A. 2015 Supp. 38-2271 applied to Mother because (1) on two or more prior occasions C.K. and R.A.K. were adjudicated CINCs while in Mother's physical custody; and (2) C.K. and R.A.K. had been in an out-of-home placement, under court order for a cumulative total period of 1 year or longer and Mother had substantially neglected or willfully refused to carry out a reasonable plan, approved by the court, directed toward reintegration of the children into her home. K.S.A. 2015 Supp. 38-2271(a)(3) and (5).

Clear and convincing evidence supports the presumption of unfitness in Mother's case. K.S.A. 2015 Supp. 38-2271(a)(3) provides a statutory presumption of unfitness

where a child in the parent's physical custody has been adjudicated a CINC on at least two prior occasions. In this case, the district court had twice adjudicated the children as CINCs. Similarly, evidence supports a second presumption of unfitness that applies when the child "has been in an out-of-home placement . . . for a cumulative total period of one year or longer and the parent has substantially neglected or willfully refused to carry out a reasonable plan . . . toward reintegration." K.S.A. 2015 Supp. 38-2271(a)(5). In the second CINC case, the children were in an out-of-home placement from May 5, 2014, until the district court terminated parental rights on April 5, 2016. Over the course of the entire case, Mother willfully refused to comply with the condition of her plan that she not allow W.R. to have contact with the children. She repeatedly lied to service providers about the nature of her relationship with W.R. Mother does not argue that either statutory presumption should not apply in her case.

Clear and convincing evidence supports the district court's finding that Mother was unfit and would remain unfit for the foreseeable future based on statutory factors under K.S.A. 2015 Supp. 38-2269. Despite the DCF substantiation of sexual abuse, Mother continued to allow W.R. to have contact with her children, in violation of court orders. Mother testified that she believed W.R. over her son regarding the abuse allegations. She stated she wanted to continue as a family unit with W.R., and W.R. testified at the hearing that he and Mother were engaged. Mother's behavior gave no indication she intended to end her relationship with W.R., despite the domestic disturbance and reports from the children that W.R. was physically abusive to Mother and the children. In doing so, Mother exposed her children to abuse and demonstrated an unwillingness to change her conduct or conditions.

Additionally, clear and convincing evidence demonstrates public and private agencies made reasonable efforts to rehabilitate the family, and those efforts failed. Mother testified she had been in therapy for depression since 2011 and had attended two sessions of domestic violence training recently as per her recommendations. She attended

15

family therapy with R.A.K. and C.K. during both CINC cases. Despite these services, Mother continued to lie about her living situation and her relationship with W.R.

Mother's only argument regarding her fitness is that W.R.'s substantiation for sexual abuse should not have been so important, and his acquittal of criminal charges should have carried more weight. She argues that the DCF substantiation process is secretive and not subject to due process standards. Because a jury acquitted W.R. of any criminal charges, the substantiation should not have served as the basis of the termination of her parental rights.

Mother does not cite any authority in support of her argument or explain why her argument is sound despite a lack of supporting authority. See *University of Kan. Hosp. Auth. v. Board of Comm'rs of Unified Gov't*, 301 Kan. 993, 1001, 348 P.3d 602 (2015) (holding failure to support a point with pertinent authority or show why it is sound despite a lack of supporting authority or in the face of contrary authority is akin to failing to brief the issue). What her argument fails to acknowledge is the DCF substantiation did not lead to the termination of her parental rights. What led to the termination of Mother's parental rights was her willful and long-standing violation of an express condition of her parenting plan regarding her children's safety. Mother allowed W.R. to have contact with her children despite court orders. While violation of a no-contact order alone may not be sufficient to demonstrate unfitness, there were allegations of physical abuse and substantiated sexual abuse. See *In re C.W.*, No. 113,547, 2015 WL 5311260, at *18-19 (Kan. App. 2015) (unpublished opinion) (finding violation in mother's decision to remain with father despite credible allegations father sexually abused child demonstrated unfitness). Mother repeatedly lied to service providers about the nature of her relationship with W.R. and encouraged her children to do the same. While Mother may have felt this particular condition was unfair, this does not excuse her willful defiance of the court's orders or the intentional endangerment of her children.

16

Mother does not challenge the district court's determination that the conduct or conditions causing her unfitness were unlikely to change in the foreseeable future. Therefore, she has abandoned this claim. *Superior Boiler Works, Inc. v. Kimball*, 292 Kan. 885, 889, 259 P.3d 676 (2011) (holding an issue not briefed by the appellant is deemed waived or abandoned). Nevertheless, the court may predict parents' future unfitness based on their past conduct. *In re Price*, 7 Kan. App. 2d 477, 483, 644 P.2d 467 (1982). Courts view the "foreseeable future" element through the child's perspective rather than the parents'. *In re S.D.*, 41 Kan. App. 2d 780, 790, 204 P.3d 1182 (2009). In this case, Mother maintained her relationship with W.R. throughout almost the entirety of the case. She regularly lied to service providers about her current situation, even when confronted with conflicting evidence. Based on this, Mother's conduct was unlikely to change in the foreseeable future.

The proper standard of review for the best interests determination in a termination hearing is abuse of discretion. *In re R.S.*, 50 Kan. App. 2d 1105, 1116, 336 P.3d 903 (2014). A district court abuses its discretion when its decision is (1) arbitrary, fanciful, or unreasonable, (2) based on an error of law, or (3) founded on an error of fact. *Northern Natural Gas Co. v. ONEOK Field Services Co.*, 296 Kan. 906, 935, 296 P.3d 1106 (2013). When determining whether termination was in the child's best interests, courts must give primary consideration to the child's physical, mental, and emotional health. K.S.A. 2015 Supp. 38-2269(g)(1).

The district court did not abuse its discretion in finding termination of Mother's parental rights was in the best interests of the children. Crawford testified the children would experience some harm and possibly develop behavioral issues if the court terminated Mother's parental rights. She worried, however, that the cycle of abuse would continue if the children reintegrated with Mother. Both children were clear that they did not want to live with W.R., yet Mother had shown no signs of ending her relationship with him.

17

Evidence demonstrated that the children's present situation was having a negative emotional impact on them. R.A.K.'s foster mother noted he had regressed both at school and at home, at times being disruptive and at other times appearing sad. C.K.'s foster mother noticed R.A.K. had been more hyperactive and aggressive. C.K.'s foster mother expressed concerns about the emotional toll the case was taking on C.K. She felt the case had affected C.K.'s self-esteem and her ability to trust others. C.K. had made a comment that she "feels like the people that are supposed to have her back haven't and she doesn't understand why."

In her brief, Mother points out that C.K.'s foster mother noted in a letter that C.K. had commented: "I miss my mom so much it hurts. I could just cry. . . . Holidays don't feel the same without my mom." What Mother leaves out, though, is in that same paragraph C.K.'s foster mother reported the comments: "Sometimes [i]t feels like mom chooses [W.R.] over me and [R.A.K.]" and "I feel like mom has lied to me in relation to her relationship with [W.R.]"

Mother notes R.A.K.'s difficulty adjusting to some of his foster homes, and the emotional burden the case placed on C.K. Specifically, Mother points to Crawford's testimony that C.K. "struggles with performance anxiety, catastrophic thought process, [low self-esteem], and the case requirements overwhelm her." This evidence demonstrates, however, the need to resolve the case quickly and find permanency for the children.

While the children may experience some emotional harm due to the termination of Mother's parental rights, this cannot justify placing the children in harm's way. The DCF substantiated W.R. for sexual abuse against R.A.K., but Mother chose to believe W.R. over her son. The children reported that W.R. was physically abusive towards their Mother and themselves. Despite this, Mother has shown no intention of ending her

18

relationship with W.R. or protecting her children from potential abuse. Therefore, the district court did not err in finding terminating Mother's parental rights was in the best interests of the children.

Father argues the district court erred in finding he was unfit and would remain unfit for the foreseeable future.

Father argues the district court erred in applying presumptions of unfitness in his case. The State concedes that K.S.A. 2015 Supp. 38-2271(a)(3), providing a presumption of unfitness when a child is twice adjudicated a CINC while in the physical custody of the parent, does not apply in Father's case because C.K. and R.A.K. were never in the physical custody of Father. Thus, the only presumption which can apply is K.S.A. 2015 Supp. 38-2271(a)(5), which provides for a presumption of unfitness when a child has been in out-of-home placement for a year or longer and the parent has substantially neglected or willfully refused to carry out a reasonable plan directed toward reintegration. Father argues this presumption does not apply because he did not fail to carry out any plan directed toward reintegration.

The case plan in the first CINC case aimed to reintegrate C.K. and R.A.K. with Mother because Father was overseas at the time. Carisa Ward, one of the family's case managers from February 2012 to October 2012, testified that Father completed all the case plan tasks necessary to reintegrate the children with Mother.

At the beginning of the second CINC case, Father was in prison. Talley testified Father's only case plan task at that time was to establish contact with KVC to discuss his involvement with the children and case plan tasks. Talley was satisfied with the amount of contact he had with Father, and he did not add any other requests. Father sent certificates of completion of classes while in prison without Talley asking.

19

After Father was released from prison in September 2014, he set up a meeting with Talley for October 13, 2014. Father did not show up for that meeting. Talley later learned Father was in jail for another offense. During the time Talley was the case manager, Father regularly maintained contact, signed all the necessary releases, and started the process of getting his psychological and parenting evaluations. Father was not involved in any medical or school appointments. He did visit with the children, however. Talley testified Father missed several visits in the beginning, and was often late, but his punctuality improved over the course of the case. He never obtained safe and stable housing suitable for reintegration. He had a part-time, temporary job but never provided proof of sustainable employment.

While Father's conduct may not be ideal, it arguably does not demonstrate substantial neglect or willful refusal to carry out a reasonable reintegration plan. While he failed to accomplish some case plan tasks, he did fulfill others. He maintained contact with the family's case manager. This is unlikely to change the outcome in this case, however, because clear and convincing evidence supports several statutory factors demonstrating Father's unfitness.

The district court only enumerated one of the statutory factors it relied upon in finding Father unfit. This was K.S.A. 2015 Supp. 38-2269(b)(7), or failure of reasonable efforts to rehabilitate the family. The district court's findings appear to implicate the following factors:

1. K.S.A. 2015 Supp. 38-2269(b)(1), emotional illness, mental illness, mental deficiency, or physical disability of the parent, of such duration or nature as to render the parent unable to care for the ongoing physical, mental, and emotional needs of the child;
2. K.S.A. 2015 Supp. 38-2269(b)(2), conduct toward a child of a physically, emotionally, or sexually cruel or abusive nature;

20

3. K.S.A. 2015 Supp. 38-2269(b)(5), conviction of a felony and imprisonment;

4. K.S.A. 2015 Supp. 38-2269(b)(7), failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family; and

5. K.S.A. 2015 Supp. 38-2269(b)(8), lack of effort on the part of the parent to adjust the parent's circumstances, conduct, or conditions to meet the needs of the child.

Clear and convincing evidence demonstrated Father suffered from mental illnesses which impaired his parenting abilities. Both parenting evaluators diagnosed Father with narcissism, antisocial personality traits, low impulse control, and aggressiveness. Dirks testified Father's low impulse control would set a bad example for his children. Sawyer testified that Father's narcissism and antisocial personality traits may not necessarily affect his parenting, but they could lead to emotional unavailability and poor judgment. Sawyer pointed to Father's criminal convictions and his choice to work overseas as possible results of his mental health conditions. Additionally, Father continued to exhibit impulsive and aggressive behaviors throughout the case, including sending aggressive texts to Mother, condescending emails to service providers, and inappropriate comments to C.K.

Turning to emotional abuse or neglect, Father testified he had doubts as to whether W.R. sexually abused R.A.K. He accepted the substantiation but would not form his own opinion on the issue because he did not have all the evidence. He distrusted law enforcement based on his own personal experience. The court determined this endangered the children and indicated an inability to place the children's needs and safety first.

Father argues his testimony does not mean he denied the abuse occurred, and furthermore, he was "very proactive" in keeping W.R. away from the children. Multiple service providers testified that Father was worried Mother was in contact with W.R. or

21

allowing W.R. to have contact with the children during the first CINC case. He sent police to Mother's house to do welfare checks. Mother, however, told one service provider that Father was only behaving this way "to get back at her." Mother said Father was harassing her and she was afraid of him. Moses reported that Father had told her at one point that he did not want visits with the children because his goal was to make sure Mother lost the children and W.R. ended up in jail. Jerilyn Smith, one of the family's case managers from October 2012 to January 2013, said Father had stated in an email that "it was about winning for him."

As to reasonable efforts to rehabilitate the family, Father did appear to have his alcohol use disorder under control. Father participated in several cognitive therapy classes as well as family therapy but continued to behave in an impulsive and abrasive manner to several people involved in the case, including Mother and multiple service providers. Father regularly missed or showed up late for scheduled supervised visits with his children.

As for the conviction of a felony and imprisonment, Father spent 18 months in prison on a federal criminal charge. He had a battery conviction arising from an incident involving W.R. Father testified he had not had any new charges in the past 2 years. Two service providers, however, had seen Father driving with a suspended license. Additionally, his probation had been revoked and reinstated once over the course of the second CINC case.

Clear and convincing evidence demonstrates Father was unable or unwilling to adjust his circumstances to meet the needs of his children. During the first CINC case, Father was working abroad in Iraq. He told one service provider he felt he could best take care of his children by providing stable and substantial income. Cruse testified she did not believe this was an issue of Father picking work over his children. Dirks, however, testified she believed Father was choosing a high-salaried job over raising his children.

She stated she was willing to give custody of the children to Father in the first CINC case, but he turned it down in favor of his job. According to Dirks, Father said he did not want the children but wanted Mother to have them instead.

After returning from Iraq, Father spent time in federal prison. After being released from prison, he spent two more stints in jail on separate criminal charges. Father then lived in five different residences over the span of 10 months. His longest stay in any one place was 3 to 4 months. At the time of Father's second testimony, he was living in a three-bedroom apartment with his girlfriend, her three children, and her two grandchildren. He told the court he had not planned this last move; it had "just kind of happened over time."

Father had been unable to maintain steady employment since his release from prison. He had worked at least four different jobs, some of which were only part-time. His longest period of employment was 6 weeks. He had received an other-than-honorable discharge from the U.S. Army Reserves.

Finally, Father had not demonstrated the ability to attend to R.A.K.'s needs. He did not have a detailed understanding of R.A.K.'s care routine. While he expressed an interest in learning the routine to service providers, he never followed through. In the past, he had possibly failed to give R.A.K. medication, leaving C.K. to report the missed medications to service providers.

Father does not challenge the district court's determination that the conduct or conditions causing his unfitness were unlikely to change in the foreseeable future. Therefore, he has abandoned this claim. See *Superior Boiler Works, Inc.*, 292 Kan. at 889. Based on the facts of this case, however, Father's conduct is unlikely to change in the foreseeable future. Over the course of 3 years, Father was regularly unavailable to parent his children. He had been unable to sustain steady employment or housing since

leaving prison in 2014. He exhibited aggressive and impulsive behaviors over the course of the case, even after participating in therapy.

We review the best interests determination for abuse of discretion. *In re R.S.*, 50 Kan. App. 2d at 1116. In its ruling, the district court noted the emotional toll the case was taking on both C.K. and R.A.K. The court noted the anxiety C.K. experienced because of the case. It pointed out that C.K. had become parentified and often cared for R.A.K. C.K. said she did not want to live with Father. The court found the children needed permanency and stability in their lives, but both Mother and Father were unable to provide this in the foreseeable future. Thus, termination of parental rights was in the children's best interests.

Father argues the district court did not properly focus on the physical, mental, and emotional needs of the children in making its best interests determination. The court, however, clearly acknowledged the present emotional harm to the children as well as potential harm if the case continued or the children reintegrated with either parent.

Additionally, Father argues the trial testimony provided sufficient evidence that termination of Father's rights is not in the best interests of the children. This is not the correct standard of review, though. The correct standard of review is abuse of discretion. While Crawford testified the children might experience harm if the court terminated parental rights, the case had already taken an emotional toll on the children. A reasonable person could agree that Father could not provide the permanency and stability the children needed, so their best interests required termination of Father's parental rights.

Affirmed.

ATCHESON, J., concurring: I concur in the result. The Douglas County District Court had legally and factually sufficient grounds to find K.W. and W.K. unfit parents due to circumstances that were unlikely to change in the foreseeable future. And the district court correctly found the interests of C.K. and R.A.K., their children, would best be served by terminating parental rights. See K.S.A. 2015 Supp. 38-2269(a), (g)(1). The termination order, therefore, was properly entered, and I would affirm, although my reasons are somewhat narrower than what the majority outlines.

As to K.W., the evidence showed that C.K. and R.A.K. had been removed from her custody in an earlier child-in-need-of-care proceeding when R.A.K. alleged W.R., her live-in boyfriend, had sexually assaulted him. W.R. was criminally charged and found not guilty in a jury trial. But the Department for Children and Families investigated and deemed the allegation "substantiated"—an administrative determination based on a preponderance of information developed during the investigation. See K.A.R. 30-46-10(k). As part of the family reunification in the earlier proceeding, the district court ordered that K.W. not reside with W.R.

In this proceeding, the evidence showed that K.W. continued to live with W.R. in defiance of the court order and lied about it to various people, including DCF representatives. She also enlisted C.K. and R.A.K. to lie about W.R.'s residence in their home. W.R. attacked and beat K.W. at least one time in the presence of the children. And the children reported that K.W. and W.R. frequently argued.

The district court found, among other grounds, that K.W.'s actions in that respect demonstrated parental unfitness. See K.S.A. 2015 Supp. 38-2269(b)(8) (unwillingness of parent to "adjust [his or her] circumstances, conduct or conditions to meet the needs of the child"). It's not clear to me from the record whether the district court made a factual

25

finding that W.R. had sexually assaulted R.A.K. or gave some sort of preclusive effect to DCF's determination. Even if the district court did neither, K.W.'s deliberate and ongoing violation of the order regarding W.R., especially coupled with her use of the children to carry out the deception, evinced the sort of wrongful conduct and poor judgment warranting a finding of unfitness. Moreover, W.R.'s actions and presence—wholly apart from the alleged sexual abuse—created a deleterious, emotionally abusive, and likely dangerous home environment, only adding to K.W.'s unfitness in failing to see to the legitimate needs of C.K. and R.A.K. The record evidence was such that a rational factfinder could have found K.W.'s unfitness to be "highly probable, *i.e.*, [supported] by clear and convincing evidence"—the standard by which we review the district court's determination. *In re B.D.-Y.*, 286 Kan. 686, 705, 187 P.3d 594 (2008). Similarly, the district court properly found that K.W.'s unfitness was unlikely to change given the lengths K.W. went to to protect her live-in relationship with W.R. and her persistence in maintaining that relationship.

As to W.K., the evidence showed that he had not maintained any sort of regular housing that would have been suitable for the children. At the time of the termination hearing, W.K. lived with a woman, her three children, and her two grandchildren in a three-bedroom apartment. Although a caseworker had not reviewed the housing, W.K.'s description of the size of the apartment and the occupancy rendered it physically unsuitable for two additional children. W.K. offered only a spotty recent work history without substantial evidence of having exercised real diligence in securing stable employment and presented no substantial evidence he would be able to provide for even minimal essentials of food, clothing, and the like for C.K. and R.A.K. See K.S.A. 2015 Supp. 38-2202(t)(1).

In addition, as the majority points out, R.A.K. has been diagnosed with Asperger's Syndrome, requiring particularly attentive parenting. W.K. was dismissive of the diagnosis and the condition itself, strongly suggesting an unwillingness to be responsive

26

to R.A.K.'s special needs. Finally, W.K. has displayed a consistently volatile and often threatening personality.

W.K. has shown no particular inclination to improve any of those circumstances, conditions, or behaviors. That supports the district court's findings of both unfitness as to him, as set out in K.S.A. 2015 Supp. 38-2269(b)(8), and the unlikelihood of change in the foreseeable future.

All of that evidence, likewise, warrants the district court's conclusion that the best interests of C.K. and R.A.K. would be advanced by terminating the parental rights of K.W. and W.K. The best-interests determination is entrusted to the district court's sound discretion based on a preponderance of the evidence. *In re R.S.*, 50 Kan. App. 2d 1105, 1115-16, 336 P.3d 903 (2014). The district court understood the relevant facts and applied the proper law. And the conclusion is one other judicial officers would have reached under comparable circumstances. So there was no abuse of discretion. See *Northern Natural Gas Co. v. ONEOK Field Services Co.*, 296 Kan. 906, 935, 296 P.3d 1106 (2013); *State v. Ward*, 292 Kan. 541, Syl. ¶ 3, 256 P.3d 801 (2011).

For those reasons, the district court's termination order should be affirmed. And for those reasons, I concur in the result the majority reaches.